RICHMOND and another, Appellants, vs. CRETENS,
Respondent.

*October 18—November 15,'1921.*

*Sales: Warranty: Adulterated goods: Trial: Issue: Form of ver-
dict: Damages.*

1. In an action for damages for breach of warranty because the
   article sold was adulterated, the question submitted by the
   court to the jury, viz. "Did the defendant adulterate the
   potash which he sold to the plaintiffs?" *held* error, the ques-
   tion being whether the potash was in fact adulterated, not
   whether the defendant adulterated it.
2. The parties having entered into a stipulation on the trial that
   "there is only one question to be determined by the jury and
   that is whether the potash sold by the defendant to the
   plaintiffs was in fact adulterated," *held* no request that a
   question to that effect be submitted to the jury was necessary,
   the stipulation being a sufficient request by both parties for
   the submission of such question.
3. The measure of damages for breach of warranty is the loss
   directly and naturally resulting in the ordinary course of
   events from such breach. This is the difference between the
   value of the goods at the time of delivery to the buyer and
   the value they would have had if they had answered to the
   warranty, in the absence of special circumstances showing
   proximate damage of a greater amount.

APPEAL from a judgment of the circuit court for Price
county: G. N. RISJORD, Circuit Judge. *Reversed.*

In November, 1917, plaintiffs were refiners and handlers
of crude potash at Shawano, Wisconsin. The defendant was
a manufacturer of crude potash at Phillips, Wisconsin. On
the 24th day of that month plaintiffs wrote defendant
stating that they were refiners and handlers of first sorts
potash in large quantities and asked for the lowest cash
price on such product, saying "We have no objection to buy-
ing this material on terms of sight draft attached to bill of
lading if you will guarantee your potash is of prime quality
and not adulterated with salt or any foreign matter." On

November 26th defendant replied to plaintiffs' inquiry, saying "Will sell you crude potash for thirty-five cents f. o. b. Phillips. Answer at once if wanted." There was an oral acceptance of this proposition and, pursuant thereto, defendant shipped plaintiffs 3,037 pounds of potash at the agreed price of thirty-five cents per pound, which was paid by plaintiffs. An analysis of the product sold showed a decided deficiency of potassium hydroxide and an excessive proportion of sodium chloride (salt) and potassium sulphate. Unadulterated crude potash contains less than two per cent. salt. It appears that salt cannot be introduced into potash except during the process of manufacture, and that this could be accomplished by putting salt into the ashes or into the product about the time it was to be cooled. Before plaintiffs had received the chemical analysis of the potash purchased from defendant they had proceeded to refine it. According to the evidence the refined product was worth but forty cents a pound because of the excessive salt adulteration, whereas if the crude product received from the defendant had been unadulterated the refined product would have been of the value of seventy-five cents a pound. This was the only evidence submitted by plaintiffs as to the damages sustained. There was no evidence to show the market value of the crude product in its pure and in its adulterated state.

The defendant, testifying in his own behalf, denied that he had in any manner adulterated the potash sold by him to plaintiffs and denied as well that he had instructed his employees to introduce salt into the product during the course of manufacture. He also produced one person who was in his employ at the time this potash was manufactured, who testified that he was around the plant about half of the time and that he did not see any salt introduced into the product during the course of manufacture. The defendant did not testify as to how many men he had in his employ, but it appears from the testimony of the employee who did testify that there was at least one other person in defendant's employ at that time. He was not produced as a witness.

At the close of the evidence the parties stipulated that the question of the amount of damages should not be submitted to the jury, but that the question of the measure and amount of damages should be determined by the court. It was further stipulated that "there is only one question to be determined by the jury, and that is whether the potash sold by the defendant to the plaintiffs was in fact adulterated." The question which the court submitted to the jury was this: "Did the defendant adulterate the potash which he sold to the plaintiffs?" The jury answered this question No, and the court rendered judgment on such verdict in favor of the defendant and against the plaintiffs. From the judgment so entered the plaintiffs appealed.

*A. M. Andrews* of Shawano, for the appellants.

For the respondent there was a brief by *G. R. Empson* of Gladstone, Michigan, and *Olin, Butler, Thomas, Stebbins & Stroud* of Madison, and oral argument by *Byron H. Stebbins.*

Owen, J. Plaintiffs contend that the question submitted by the court to the jury was not responsive to the issue in the case. They contend that the issue was whether the potash was in fact adulterated and not whether the defendant adulterated it. In their letter of inquiry the plaintiffs said: "We have no objection to buying this material on terms of sight draft attached to bill of lading if you will guarantee your potash is of prime quality and not adulterated with salt or any foreign matter." The price which the defendant quoted plaintiffs was in response to this letter, and must be held to have been in conformity with the terms and conditions mentioned in plaintiffs' letter of inquiry. This amounts to a plain warranty on the part of defendant that the potash so sold was of prime quality and not adulterated with salt or any foreign matter. If the potash furnished was in fact adulterated it amounted to a breach of defendant's warranty regardless of whether he himself did or did not adulterate it. He contracted to furnish potash of a prime and

unadulterated quality. If the product furnished was not of such quality it amounted to a breach of warranty. The question submitted, therefore, did not cover the real issue in the case. The jury might have found that the defendant did not adulterate the product without necessarily finding that the product furnished was unadulterated.

Respondent contends, however, that the question does in fact submit the real issue, in view of the evidence in the case, from which it appears that if the product was adulterated it must have been adulterated in the course of manufacture; that the testimony of the defendant and his employee, produced as a witness, to the effect that the defendant did not adulterate the product while in the course of manufacture, conclusively shows that the product was not, and could not have been, adulterated if such testimony was believed by the jury. This does not necessarily follow. There is nothing to show that the employee who was not produced as a witness did not adulterate the product or that it was not adulterated by some one else. The chemical analysis showed that the potash was adulterated and that the product refined therefrom was of an inferior quality. This is strong evidence that the product was in fact adulterated, to overthrow which every avenue of opportunity to adulterate it should be closed by defendant's evidence. This the evidence produced on the part of defendant failed to do. There was, therefore, room left for the jury to find that the potash was in fact adulterated even though they were satisfied from the evidence that the defendant did not adulterate it. The issue tried called for the submission of the question of whether the potash was in fact adulterated, and the court was in error in limiting the issue to the question of whether the defendant adulterated the potash, as was done by the question which was submitted to the jury.

It is further contended on the part of the respondent that it was the duty of the appellants to specifically request that the proper question be submitted to the jury, and that in the

absence of such request such fact must be deemed to have
been determined by the court in conformity with its judg-
ment, and that appellants' neglect or omission to so request
amounts to a waiver, and a consent that such omitted fact
be determined by the court, by virtue of sec. 2858m, Stats.,
which provides:

"Whenever any special verdict shall be submitted to a jury
and there is omitted therefrom some controverted matter of
fact not brought to the attention of the trial court by request
but essential to sustain the judgment, such matter of fact
shall be deemed determined by the court in conformity with
its judgment and the neglect or omission to request a finding
by the jury on such matter shall be deemed a waiver of jury
trial *pro tanto* and a consent that such omitted fact be deter-
mined by the court. The finding or determination of such
omitted fact by the court may be reviewed on appeal without
any exception thereto."

We have the stipulation of the parties entered into at the
close of the evidence to the effect "that there is only one
question to be determined by the jury, and that is whether
the potash sold to the plaintiffs was in fact adulterated,"
which was a sufficient request not only by the appellants but
by respondent that that question be submitted to the jury. It
would be most technical, indeed, to require a party, in addi-
tion to a stipulation of this kind, to make an additional re-
quest that the question so stipulated be submitted to the jury.
The action of the court in submitting a different question
must be construed as a refusal to submit the question agreed
upon.

At the close of the evidence the respondent moved for a
nonsuit on the ground that there was no evidence showing
that plaintiffs had sustained any damage by reason of the
breach of the warranty. It is argued that this motion should
have been granted, and that the judgment appealed from
should not be reversed even though the issues were not prop-
erly submitted to the jury, because in no event are plaintiffs
entitled to judgment. This contention is sound if, as a matter

of fact, there is no evidence upon which substantial damages can be predicated. The measure of damages for breach of warranty is the loss directly and naturally resulting in the ordinary course of events from such breach. This is the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if they had answered to the warranty, in the absence of special circumstances showing proximate damage of a greater amount. Sec. 1684t—69, Stats.

Plaintiffs' letter of inquiry advised the defendant that they were refiners and handlers of first sorts potash. While this did not expressly inform the defendant that this particular potash was desired for refining purposes, it did advise him that the potash was desired either for refining purposes or for the purposes of resale. He knew, therefore, that the product was likely to be refined by the plaintiffs, and that, if so, the refined product would be of a much inferior quality if the crude product was adulterated. Damages resulting from the refining of the product, therefore, were plainly within the contemplation of the parties to the contract of sale, and constituted a proximate result of the breach of the warranty. *Hammond v. Sandwich Mfg. Co.* 146 Wis. 485, 131 N. W. 1097. In this view, the record presents facts which will sustain the assessment of substantial damages.

For the reasons stated the judgment must be reversed, and the cause remanded for a new trial.

*By the Court.*—So ordered.